**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


Candy M. Ball,                                    :                    Case No. 1:12 CV 2488

                                                 :

        Plaintiff,                               :

                                                 :

v.                                               :

                                                 :

Commissioner of Social Security,                 :                    **REPORT AND**

        Defendant,                               :                    **RECOMMENDATION**


## I. INTRODUCTION

Plaintiff Candy M. Ball ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her claim

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

and XVI, respectively, of the Social Security Act, 42 U.S.C. §§§ 416(i), 423, and 1381 (Docket No. 1).

Pending are the parties' Briefs on the Merits (Docket Nos. 12 and 13) and Plaintiff's Response

(Docket No. 14). For the reasons that follow, the Magistrate recommends that the decision of the

Commissioner be affirmed in part and reversed and remanded in part.

## II. PROCEDURAL BACKGROUND

1

On October 6, 2008, Plaintiff filed an application for a period of DIB under Title II of the

Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 10, p. 127 of 433). On that same day,

Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381

(Docket No. 10, p. 121 of 433). In both applications, Plaintiff alleged a period of disability beginning

March 5, 2008 (Docket No. 10, pp. 121, 127 of 433). Plaintiff's claims were denied initially on March

3, 2009 (Docket No. 10, pp. 75, 79 of 433), and upon reconsideration on May 27, 2009 (Docket No.

10, pp. 85, 87 of 433). Plaintiff thereafter filed a timely written request for a hearing on July 7, 2009

(Docket No. 10, p. 92 of 433).

On November 29, 2010, Plaintiff appeared, *pro se*, for a hearing before Administrative Law

Judge Michael Breton ("ALJ Breton") (Docket No. 10, pp. 51-66 of 433). Also appearing at the

hearing was an impartial Vocational Expert ("VE") (Docket No. 10, pp. 64-66 of 433), and Plaintiff's

grandfather, Clifton Young ("Mr. Young") (Docket No. 10, pp. 61-64 of 433). ALJ Breton found

Plaintiff to have a severe combination of obesity and depression with an onset date of March 5, 2008

(Docket No. 10, p. 42 of 433).

Despite these limitations, ALJ Breton determined that, based on all the evidence presented,

Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the

alleged onset date through the date of his decision (Docket No. 10, p. 46 of 433). ALJ Breton found

Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels

with the following limitations: (1) no more than occasional climbing; (2) avoid exposure to ladders and

hazards, including dangerous machinery; and (3) only engage in simple, routine, and unskilled tasks

(Docket No. 10, pp. 43-44 of 433). ALJ Breton found Plaintiff capable of performing her past relevant

work as a general laborer (Docket No. 10, p. 46 of 433). Plaintiff's request for benefits was therefore

2

denied (Docket No. 10, p. 46 of 433).

On October 4, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of her denial of DIB and SSI (Docket No. 1). In her pleading, Plaintiff alleged that the ALJ failed to: (1) find Plaintiff's Attention Deficit Hyperactivity Disorder ("ADHD") to be a severe impairment; and (2) properly assess Plaintiff's mental residual functional capacity (Docket No. 12). Defendant filed its Answer on December 20, 2012 (Docket No. 9).

### III. FACTUAL BACKGROUND

#### A. THE ADMINISTRATIVE HEARING

An administrative hearing convened on November 29, 2012, in Springfield, Massachusetts (Docket No. 10, p. 40 of 433). Plaintiff, *pro se*, appeared and testified via video from Mansfield, Ohio (Docket No. 10, pp. 56-61 of 433). Also present and testifying was Plaintiff's grandfather, Mr. Young (Docket No. 10, pp. 61-64) and VE Michael Dorvell ("VE Dorvell") (Docket No. 10, pp. 64-66 of 433).

#### 1. PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was a thirty-year-old female with one two-year-old son (Docket No. 10, p. 56 of 433). Plaintiff testified that she graduated from high school (Docket No. 10, p. 56 of 433). Plaintiff indicated that she had a minor criminal history which included two misdemeanors, one for possession of marijuana, and another for fighting with her roommate's son (Docket No. 10, pp. 58-59 of 433).

Plaintiff stated that she last worked at a clothing thrift store as a general laborer inspecting clothes (Docket No. 10, p. 57 of 433). Plaintiff was placed in this job by the Ohio Department of Job and Family Services ("ODJFS") and worked thirty hours per week (Docket No. 10, pp. 56-57 of 433).

3

Plaintiff was terminated in September 2010, and testified that she would have otherwise continued working in the store (Docket No. 10, pp. 57-58, 61 of 433). When asked, Plaintiff stated that her biggest obstacle to returning to working was her tendency to get easily distracted and her need to constantly be moving around (Docket No. 10, p. 58 of 433).

Plaintiff testified briefly about her depression (Docket No. 10, p. 60 of 433). Plaintiff stated that she had been diagnosed with depression and had been going to counseling for over a year (Docket No. 10, p. 60 of 433). She also indicated that she takes Trazodone to help her sleep and Zoloft to help with her depression (Docket No. 10, p. 60 of 433). According to Plaintiff, these medications do not work (Docket No. 10, p. 60 of 433).

With regard to her residual functional capacity, Plaintiff indicated that she can drive, cook, clean, and do the laundry for herself and her son (Docket No. 10, p. 59 of 433). Plaintiff also testified that she can go grocery shopping alone, but prefers to go with her grandmother (Docket No. 10, p. 59 of 433). Plaintiff takes care of her son and can change and bathe him on her own (Docket No. 10, p. 59 of 433).

### 2.    MR. YOUNG'S TESTIMONY

Plaintiff's grandfather, Mr. Young, testified that Plaintiff lived with him and his wife until three years prior to the hearing (Docket No. 10, p. 62 of 433). He stated that Plaintiff had been diagnosed with ADHD and alleged that Plaintiff had anger management problems (Docket No. 10, p. 62 of 433). When asked to explain these anger management issues, Mr. Young stated "I know if you go in the grocery store with her, she's going to get into [an] argument with somebody in there, standing someplace where she don't think they should be" (Docket No. 10, p. 62 of 433). Mr. Young also claimed that Plaintiff suffered from a sleep disorder and alleged that Plaintiff does not handle money

4

well (Docket No. 10, p. 63 of 433). Mr. Young testified that Plaintiff spends money on a whim and has her grandparents manage her welfare checks (Docket No. 10, pp. 63-64 of 433).

### 3.    VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a clothing sorter in a non-profit organization as light and unskilled, and as a general laborer as medium and unskilled (Docket No. 10, p. 65 of 433). The ALJ then posed his first hypothetical question:

> Assume we have an individual with the same age, educational background and past work experience as the claimant. Further assume the individual retains a residual functional capacity for work with the following additional limitations: there would be no exertional limitations; there would be no more than occasional climbing; no ladders; no hazards or dangerous machinery; the individual would be limited to simple, routine, unskilled tasks. Given those limitations, could such an individual perform the claimant's past relevant work?

(Docket No. 10, p. 65 of 433). Taking into account these limitations, the VE testified that such an individual would be able to perform all of Plaintiff's past relevant work (Docket No. 10, p. 65 of 433).

ALJ Breton then posed his second hypothetical question, stating "[f]urther assume that the individual would have marked limitations in the abilities to maintain persistence and pace, given those limitations, could such an individual perform the claimant's past work or any other work?" (Docket No. 10, p. 65 of 433). The VE testified that, with these additional limitations, such an individual would be incapable of performing both Plaintiff's past relevant work as well as any other work in the national economy on a regular, sustained, full-time basis (Docket No. 10, p. 66 of 433).

### B.    MEDICAL RECORDS

1.      CHILDHOOD MEDICAL AND EDUCATIONAL RECORD

Plaintiff's childhood medical record dates back to May 23, 1986, when Plaintiff was seen at the

Chapman Clinic in Fort Worth, Texas, by what appears to be a general practice family physician

(Docket No. 10, p. 290 of 433). On June 26, 1991, at the age of ten, Plaintiff underwent a Gordon

Diagnostic System test to assess her delay, vigilance, and distractibility tasks (Docket No. 10, p. 189 of

433). With regard to delay tasks, Plaintiff's results showed a mixture of scores ranging from normal to

abnormal (Docket No. 10, p. 189 of 433). Plaintiff had a significant tendency toward being impulsive

and her response to situations was unpredictable (Docket No. 10, p. 189 of 433). Plaintiff's vigilance

tasks showed that Plaintiff had a significant deficit in her ability to sustain attention, consistent with

ADHD (Docket No. 10, p. 189 of 433). Results from the distractibility tasks confirmed these

assessments (Docket No. 10, p. 189 of 433). A summary of Plaintiff's test results indicate that Plaintiff

had problems with depression and anxiety that were prominent with ADHD (Docket No. 10, p. 189 of

433). Plaintiff also possessed a number of traits that were consistent with an ADHD diagnosis,

including being: argumentative, confused and crying, cruel to animals and playmates, disobedient, and

easily frustrated (Docket No. 10, p. 190 of 433). Test results also showed that Plaintiff possessed very

strong feelings of inferiority, would act immaturely and lie, and would engage in temper tantrums and

loud play (Docket No. 10, p. 190 of 433). It was recommended that Plaintiff undergo complete

psychological, learning disability, and IQ testing, as well as a pharmacotherapy assessment (Docket

No. 10, p. 190 of 433).

Plaintiff was prescribed Ritalin on September 7, 1991 (Docket No. 10, p. 291 of 433). Her

dosage gradually increased from five milligrams per day to twenty milligrams per day (Docket No. 10,

p. 291 of 433). Plaintiff remained on the twenty-milligram dosage from October 29, 1991, through

May 20, 1994 (Docket No. 10, pp. 291-93 of 433).

Plaintiff's grades were a mixture of average and below average (Docket No. 10, pp. 158, 161, 178, 183 of 433). Standardized testing indicated that Plaintiff's intellectual ability was above the mentally retarded range (Docket No. 10, p. 176 of 433). A Comprehensive Individual Assessment found Plaintiff demonstrated significant academic or developmental deficits in the areas of math, written language, reading, and spelling (Docket No. 10, p. 175 of 433). Plaintiff began special education classes in the fourth grade (Docket No. 10, p. 171 of 433). She continued to receive such services through high school (Docket No. 10, p. 170 of 433). By tenth grade, there was concern that Plaintiff's high school graduation was in jeopardy (Docket No. 10, p. 178 of 433). Plaintiff's Individualized Education Program ("IEP") indicated that Plaintiff was exempt from some proficiency tests, but was required to take a ninth grade proficiency exam in both reading and math in order to graduate (Docket No. 10, p. 150 of 433).

### 2.    CURRENT MENTAL HEALTH MEDICAL RECORD[1]

Plaintiff's current medical record dates back to June 2008 when Plaintiff reported for Alcohol and Drug Usage Screenings on June 13, 2008, at New Beginnings Recovery Services ("New Beginnings") (Docket No. 10, p. 433 of 433). Plaintiff was referred to New Beginnings' weekly Women's Group Counseling for a period of eight weeks (Docket No. 10, p. 344 of 433). Plaintiff was discharged from New Beginnings on September 10, 2008 (Docket No. 10, p. 344 of 433).

Plaintiff's mental health treatment records then jump to March 31, 2009, when Plaintiff first sought treatment at the Marion Area Counseling Center ("MACC") (Docket No. 10, p. 372 of 433).

---

[1] Plaintiff's medical record contains very little about her physical health. Of notable importance is the birth of Plaintiff's son in October 2008 and Plaintiff's subsequent elective sterilization (Docket No. 10, p. 312 of 433).

Plaintiff admitted to being depressed and having a poor attitude (Docket No. 10, pp. 372-73 of 433).

Plaintiff described herself as being "very impulsive" and indicated that she had worked eight jobs in

the past five years (Docket No. 10, pp. 374, 378 of 433). Plaintiff was diagnosed with ADHD,

depressive disorder, and cannabis dependence (episodic) (Docket No. 10, p. 381 of 433). She was also

assigned a Global Assessment of Functioning ("GAF") score of fifty-two[2] (Docket No. 10, p. 381 of

433). Plaintiff was recommended for psychiatric services and psychotherapy (Docket No. 10, p. 381 of

433).

On May 12, 2009, Plaintiff underwent an initial psychiatric evaluation at MACC with Certified

Nurse Practitioner Robin Siefker ("Ms. Siefker") (Docket No. 10, pp. 410-15 of 433). Plaintiff was

well-groomed, although overweight, and had an average demeanor, eye contact, and activity (Docket

No. 10, p. 412 of 433). She demonstrated average intelligence and clear speech, and her thought

process was logical (Docket No. 10, pp. 412-13 of 433). Plaintiff had difficulty with attention and

concentration, but had fair insight and judgment (Docket No. 10, p. 413 of 433). Her mood was

depressed and she displayed a flat affect (Docket No. 10, p. 413 of 433). During the evaluation,

Plaintiff was quiet, but reported having trouble with depression, crying, poor sleep, lack of motivation,

anger, aggression, and throwing things (Docket No. 10, p. 410 of 433). Plaintiff also mentioned a

tendency for impulsive spending (Docket No. 10, p. 410 of 433). Plaintiff reported a past problem with

alcohol and marijuana, indicating heavy usage (Docket No. 10, p. 410 of 433). She stated that she last

used marijuana in early 2008 (Docket No. 10, p. 410 of 433).

---

[2] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of 52 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

Ms. Siefker diagnosed Plaintiff with: (1) major depression, single episode; (2) ADHD, predominantly inattentive type; (3) cannabis dependence in partial remission; and (4) a dependent personality disorder (Docket No. 10, p. 413 of 433). Plaintiff was assigned a GAF score of forty[3] (Docket No. 10, p. 414 of 433). Ms. Siefker prescribed Plaintiff Trazodone, fifty milligrams once per day, and Wellbutrin, 150 milligrams once per day (Docket No. 10, p. 414 of 433).

Plaintiff returned to Ms. Siefker on May 27, 2009, reporting a slight improvement in her mood (Docket No. 10, p. 407 of 433). Plaintiff claimed she was sleeping better and had experienced slight improvement in her focus and concentration (Docket No. 10, p. 407 of 433). She was still struggling with motivation and some irritability (Docket No. 10, p. 407 of 433). Ms. Siefker found Plaintiff's mood to be anxious and her affect blunted (Docket No. 10, p. 407 of 433). She increased Plaintiff's Wellbutrin to 150 milligrams twice per day, for a total daily dosage of 300 milligrams (Docket No. 10, p. 408 of 433).

On July 6, 2009, Plaintiff saw Certified Nurse Practitioner Mary Rosini Abbott[4] ("Ms. Abbott") (Docket No. 10, p. 404 of 433). Plaintiff was weepy and she reported feeling depressed and having trouble sleeping (Docket No. 10, p. 404 of 433). Ms. Abbott decided to change Plaintiff's prescriptions, weaning her off of the Wellbutrin and replacing it with twenty-five milligrams of Zoloft once per day (Docket No. 10, p. 405 of 433).

Plaintiff returned to Ms. Abbott on August 3, 2009 (Docket No. 10, p. 401 of 433). She indicated that the Zoloft was not working as well as it did initially and reported only being able to

---

[3] A score of 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM-IV at 34.

[4] Ms. Siefker left MACC some time after Plaintiff's May 2009 session. Ms. Abbott was her replacement.

sleep when she took the Trazodone (Docket No. 10, p. 401 of 433). Plaintiff also indicated that she overate when she became anxious and could not sleep (Docket No. 10, p. 401 of 433). Despite Plaintiff's report, Ms. Abbott noted that Plaintiff's mood was brighter and her weepiness was gone (Docket No. 10, p. 402 of 433). Ms. Abbott increased Plaintiff's Zoloft to fifty milligrams once per day (Docket No. 10, p. 402 of 433). By September 2009, Plaintiff appeared "much improved on [her] change to Zoloft" (Docket No. 10, p. 399 of 433). However, Plaintiff reported being in a "funk" (Docket No. 10, p. 398 of 433).

On October 27, 2009, Plaintiff was reportedly doing well and denied having any problems (Docket No. 10, p. 395 of 433). Her mood appeared brighter and Ms. Abbott noted that Plaintiff was "much improved and progressing well on current medications" (Docket No. 10, p. 396 of 433). Plaintiff received a similar report during a November 24, 2009, progress session (Docket No. 10, pp. 392-93 of 433). Her Zoloft was increased to seventy-five milligrams per day (Docket No. 10, p. 393 of 433).

On January 5, 2010, Plaintiff saw Licensed Social Worker Irene Johnson ("Ms. Johnson") (Docket No. 10, p. 416 of 433). Plaintiff indicated that her motivation had increased, but reported that there were still times when she felt depressed (Docket No. 10, p. 416 of 433). Plaintiff stated that this depression occurred at most a couple of times per week (Docket No. 10, p. 416 of 433). She reported socializing and being placed on a job site (Docket No. 10, p. 416 of 433).

Plaintiff returned to Ms. Abbott on January 19, 2010 (Docket No. 10, p. 389 of 433). At that time, Plaintiff stated that she was doing well and denied any problems (Docket No. 10, p. 389 of 433). Plaintiff's mood was brighter and Ms. Abbott noted that Plaintiff was "much improved and progressing well on current medications" (Docket No. 10, pp. 389-90 of 433). Plaintiff's Zoloft was

10

increased to 100 milligrams per day (Docket No. 10, p. 390 of 433). During a March 16, 2010,

appointment with Ms. Abbott, Plaintiff reported doing well and denied any problems (Docket No. 10,

pp. 386-87 of 433). On May 10, 2010, Plaintiff returned to Ms. Johnson, who assigned Plaintiff a GAF

score of sixty[5] (Docket No. 10, p. 422 of 433).

During a May 24, 2010, appointment at MACC, Plaintiff reported that she was doing well

(Docket No. 10, p. 385 of 433). Her moods were under control, even though Plaintiff indicated that she

had some intermittent sadness and depression (Docket No. 10, p. 385 of 433). Plaintiff reported some

difficulty sleeping, but it was also noted that she had poor sleep hygiene, consuming snacks and

caffeinated beverages before bed (Docket No. 10, p. 385 of 433).

Plaintiff saw Ms. Johnson on October 5, 2010 (Docket No. 10, p. 418 of 433). At that time, Ms.

Johnson indicated that Plaintiff's anticipated goal/discharge date from MACC was January 5, 2011

(Docket No. 10, p. 419 of 433).

Plaintiff's records then jump to July 20, 2011, and a psychiatric evaluation conducted by Dr.

Patrick E. Bentley, DO ("Dr. Bentley") at Community Counseling Services ("CCC") (Docket No. 10,

pp. 429-32 of 433). Plaintiff indicated that she had been seeing a counselor to better deal with her

explosive behaviors (Docket No. 10, p. 429 of 433). It was noted that Plaintiff had a history of

dysregulating and being quite irritable (Docket No. 10, p. 429 of 433). Dr. Bentley also noted that

Plaintiff was diagnosed with ADHD and had been prescribed Ritalin with a good response (Docket

No. 10, p. 429 of 433). During the evaluation, Plaintiff was oriented to person, place, and time, and

had a pleasant affect (Docket No. 10, p. 431 of 433). Plaintiff's sentences were well-constructed and

---

[5] A score of 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV at 34.

11

goal-oriented (Docket No. 10, p. 431 of 433). Dr. Bentley noted that Plaintiff had some symptoms of depression but did not meet the criteria for a diagnosis of true depression (Docket No. 10, p. 431 of 433). Plaintiff denied panic attacks, significant phobias, post traumatic stress disorder, obsessive compulsive disorder, auditory or visual hallucinations, or paranoid delusions (Docket No. 10, p. 431 of 433). Dr. Bentley did note that Plaintiff had prevalent symptoms of ADHD (Docket No. 10, p. 431 of 433). Plaintiff was diagnosed with: (1) intermittent explosive disorder; (2) ADHD; and (3) marijuana dependency and abuse in early remission (Docket No. 10, p. 432 of 433). She was assigned a GAF score of sixty (Docket No. 10, p. 432 of 433). Dr. Bentley indicated that Plaintiff's prognosis was guarded (Docket No. 10, p. 432 of 433). Plaintiff was started on Lamictal (Docket No. 10, p. 432 of 433).

Plaintiff returned to CCC on August 17, 2011 (Docket No. 10, p. 430 of 433). She reported some relief on the Lamictal (Docket No. 10, p. 430 of 433). Plaintiff indicated that she was in a secure living situation and had a boyfriend (Docket No. 10, p. 430 of 433). However, Plaintiff also indicated that she still felt like she could not focus and get things done (Docket No. 10, p. 430 of 433). Dr. Bentley started Plaintiff on Ritalin (Docket No. 10, p. 430 of 433).

On September 21, 2011, Plaintiff returned to CCC (Docket No. 10, p. 427 of 433). Plaintiff reported that she was recently evicted because she had an unauthorized tenant, her boyfriend, living in her apartment (Docket No. 10, p. 427 of 433). Plaintiff stated that she was not sleeping, and her dosage of Trazodone was increased to 100 milligrams per day (Docket No. 10, p. 427 of 433). She also indicated that she was less depressed and attributed her improvement to the antidepressants (Docket No. 10, p. 428 of 433). Plaintiff was continued on Ritalin (Docket No. 10, p. 428 of 433).

**C.     EVALUATIONS**

1.      PSYCHOLOGICAL EVALUATION

On January 16, 2009, Plaintiff underwent a Psychological Evaluation with Dr. J. Joseph Konieczny ("Dr. Konieczny") at the request of the Bureau of Disability Determination ("BDD") (Docket No. 10, pp. 345-51 of 433). Plaintiff was pleasant and cooperative throughout the evaluation and responded to all given questions and tasks and maintained appropriate eye contact (Docket No. 10, pp. 346, 347 of 433). Plaintiff showed no indications of undue impulsivity and denied experiencing any difficulties in controlling her temper or any history of mood swings (Docket No. 10, p. 346 of 433). She described her overall level of motivation as adequate (Docket No. 10, p. 346 of 433). Dr. Konieczny reported that Plaintiff was capable of expressing herself in a clear and coherent manner (Docket No. 10, p. 346 of 433). Plaintiff was oriented to person, place, and time (Docket No. 10, p. 347 of 433). Dr. Konieczny indicated that Plaintiff's ability to concentrate and attend to tasks was "quite adequate" (Docket No. 10, p. 347 of 433). Furthermore, Plaintiff showed "no symptoms of hyperactivity, restlessness, or inattentiveness" (Docket No. 10, p. 347 of 433). Plaintiff had only mild deficits in her overall level of judgment (Docket No. 10, p. 347 of 433).

When asked about her daily activities, Plaintiff indicated that she attends to her own hygiene (Docket No. 10, p. 347 of 433). She reported doing her own cooking, cleaning, laundry, and household activities (Docket No. 10, p. 347 of 433). She also indicated that she performed her own shopping and managed her own finances, including a checking account (Docket No. 10, p. 347 of 433).

Dr. Konieczny administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") (Docket No. 10, pp. 347-48 of 433). Plaintiff was assessed a full scale IQ score of eighty-two, which placed her in the low-average range of adult intellectual functioning (Docket No. 10, p. 348 of 433). Plaintiff showed average ability in the area of perceptual reasoning, and low-average ability in the areas of

13

verbal comprehension and processing speed (Docket No. 10, p. 348 of 433). She had relative deficits in the area of working memory, where her scores placed her in a borderline range (Docket No. 10, p. 348 of 433). Plaintiff's most marked deficits were in the area of attention and concentration, auditory imagery, and retentiveness (Docket No. 10, p. 348 of 433).

Dr. Konieczny also administered the Wechsler Memory Scale III (Docket No. 10, p. 348 of 433). Results indicated that Plaintiff's memory capabilities ranged from extremely low to average levels (Docket No. 10, p. 348 of 433). Her performance was uniform and reflective of her overall level of functioning as reported by the WAIS-IV (Docket No. 10, p. 348 of 433).

Based upon his evaluation and the administered tests, Dr. Konieczny concluded that no diagnosis of ADHD could be offered for Plaintiff (Docket No. 10, p. 348 of 433). Dr. Konieczny opined that Plaintiff demonstrated no symptoms of hyperactivity, restlessness, or inattentiveness (Docket No. 10, p. 348 of 433). The doctor noted that, "[a]lthough results of intellectual testing place [Plaintiff's] capabilities in a range that could suggest a diagnosis of Borderline Intellectual Functioning, her capabilities in several areas of intellectual and memory functioning extend beyond that which would be considered typical for an individual suffering from such a diagnosis" (Docket No. 10, p. 348 of 433). Dr. Konieczny assigned Plaintiff a GAF score of fifty-four[6] (Docket No. 10, p. 349 of 433).

## 2. PSYCHIATRIC REVIEW TECHNIQUE

On February 16, 2009, Plaintiff underwent a Psychiatric Review Technique with state examiner

---

[6] A score of 54 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV at 34.

Dr. Douglas Pawlarczyk, Ph.D ("Dr. Pawlarczyk") (Docket No. 10, pp. 352-65 of 433). Dr.

Pawlarczyk found that Plaintiff did not suffer from any medically determinable impairment (Docket

No. 10, p. 352 of 433). Given these results, Dr. Pawlarczyk did not assess either "Paragraph B" or

"Paragraph C" criteria[7] (Docket No. 10, pp. 362-63 of 433).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are

identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v.*

*Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a

"disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42

U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same

definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI

claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time

he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th

Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at

730. A "severe impairment" is one which "significantly limits  . . .  physical or mental ability to do

basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to

---

[7] Paragraph B criteria "describe impairment-related functional limitations that are incompatible
with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).
Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with
the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform.  *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Breton made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2012.

2. Plaintiff has not engaged in substantial gainful activity since March 5, 2008, the alleged onset date.

3. Plaintiff has the following severe impairments: obesity and depression.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, including the potential effects of Plaintiff's obesity on her functional status, the undersigned finds that Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but would be limited to no more than occasional climbing, would need to avoid exposure to ladders and hazards including dangerous machinery, and would be limited to simple, routine, and unskilled tasks.

6. Plaintiff is capable of performing past relevant work as a general laborer. This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

7. Plaintiff has not been under a disability, as defined in the Social Security Act, from March 5, 2008, through the date of this decision.

(Docket No. 10, pp. 40-47 of 433). ALJ Breton denied Plaintiff's request for DIB and SSI benefits (Docket No. 10, p. 46 of 433).

**VI. STANDARD OF REVIEW**

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006). In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact

that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

In her Brief on the Merits, Plaintiff alleges that the ALJ failed to account for Plaintiff's ADHD and improperly excluded it from the list of Plaintiff's severe impairments (Docket No. 12, pp. 6-10 of 13). Plaintiff also alleges that the ALJ erred in his determination of Plaintiff's mental residual functional capacity (Docket No. 12, pp. 10-13 of 13).

### B.    DEFENDANT'S RESPONSE

Defendant contends that the ALJ's decision properly accounts for all of Plaintiff's established severe impairments (Docket No. 13, pp. 12-16 of 19). Furthermore, Defendant argues that the ALJ's assessment of Plaintiff's mental residual functional capacity was based on substantial evidence contained in the record (Docket No. 13, pp. 16-19 of 19).

C.    **DISCUSSION**

1.    **SEVERE IMPAIRMENTS: ADHD**

Plaintiff first argues that the ALJ failed to account for Plaintiff's diagnosed ADHD amongst her list of severe impairments (Docket No. 12, pp. 6-10 of 13). Specifically, Plaintiff alleges that the ALJ completely ignored Plaintiff's childhood diagnosis and failed to undertake any analysis of later conflicting evaluations and opinions with regard to an ADHD diagnosis (Docket No. 12, pp. 6-10 of 13).

Defendant contends that Plaintiff's alleged ADHD was not severe and the ALJ accounted for any credible limitations in his residual functional capacity finding (Docket No. 13, p. 13 of 19). Defendant bases its argument on Dr. Konieczny's evaluation as well as Dr. Pawlarczyk's determination (Docket No. 13, pp. 13-14 of 19). Defendant alleges that Plaintiff "has not produced a single physician's opinion supporting her claim that she has significant limitations from her ADHD," seemingly ignoring Dr. Bentley's records (Docket No. 13, p. 14 of 19).

Plaintiff acknowledges that Defendant may be correct in arguing that Plaintiff does not actually suffer from ADHD, given the opinions of Drs. Koniecazny and Pawlarczyk (Docket No. 12, p. 8 of 13). However, Plaintiff argues, it is the duty of the ALJ to resolve this conflict (Docket No. 12, p. 8 of 13). This Magistrate would agree.

It is well established that the trier of fact has the duty to resolve any conflicts in medical evidence. *Richardson v. Perales*, 402 U.S. 389, 399 (1971). Judicial review "is limited in scope to determining whether the findings of fact made by the [Commissioner] are supported by substantial evidence and deciding whether the [Commissioner] employed the proper legal criteria in reaching her conclusion." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Therefore, this Court may not try

the case *de novo*, *nor resolve conflicts in evidence*, nor decide questions of credibility." *Id.* (*citing Myers v. Richardson*, 471 F.2d 1265 (6th Cir. 1972)) (emphasis added).

Plaintiff underwent a Gordon Diagnostic System test at the age of ten to assess her delay, vigilance, and distractibility tasks (Docket No. 10, p. 189 of 433). This test showed a mixture of results (Docket No. 10, p. 189 of 433). Plaintiff had a significant tendency toward being impulsive and her response to situations was unpredictable (Docket No. 10, p. 189 of 433). Plaintiff also displayed a significant deficit in her ability to sustain attention, consistent with ADHD, along with multiple traits consistent with an ADHD diagnosis (Docket No. 10, pp. 189-90 of 433). These traits included being: argumentative, confused and crying, cruel to animals and playmates, disobedient, and easily frustrated (Docket No. 10, p. 190 of 433). Test results also showed that Plaintiff possessed very strong feelings of inferiority, would act immaturely and lie, and would engage in temper tantrums and loud play (Docket No. 10, p. 190 of 433).

Plaintiff's grades were consistently average and below, although standardized testing indicated that Plaintiff's intellectual ability was above the mentally retarded range (Docket No. 10, pp. 158, 161, 176, 178, 183 of 433). Plaintiff demonstrated significant academic and developmental deficits in the areas of math, written language, reading, and spelling (Docket No. 10, p. 170 of 433). She was enrolled in special education classes beginning in the fourth grade; by tenth grade, there was concern that Plaintiff would not graduate from high school on time (Docket No. 10, pp. 171, 178 of 433). In response to some of these tests and issues, Plaintiff was prescribed Ritalin in September 1991 (Docket No. 10, p. 292 of 433). None of these records and findings were discussed in ALJ Breton's decision (Docket No. 10, pp. 40-47 of 433).

Plaintiff's current mental health records indicate that she was again diagnosed with ADHD in

20

March 2009 (Docket No. 10, p. 381 of 433). During a psychiatric evaluation in May 2009, Ms. Siefker

noted that Plaintiff had difficulty with attention and concentration and possible impulsive spending and

diagnosed Plaintiff with ADHD (Docket No. 10, pp. 410, 413 of 433). During a July 2011 psychiatric

evaluation at CCC, Dr. Bentley noted that Plaintiff had *prevalent* symptoms of ADHD and included

that in his diagnosis (Docket No. 10, pp. 431-32 of 433). Plaintiff was started on Ritalin in August

2011 (Docket No. 10, p. 430 of 433). These findings and diagnoses were only briefly mentioned by

ALJ Breton in his decision, and not in any sufficient detail (Docket No. 10, p. 43 of 433).

Admittedly, these records stand in stark contrast to the opinion of state examiner Dr.

Konieczny, which was discussed at length in the ALJ's decision (Docket No. 10, pp. 44-45, 46 of 433).

During Dr. Konieczny's exam, Plaintiff showed no indications of undue impulsivity and denied

experiencing any difficulties in controlling her temper or any history of mood swings (Docket No. 10,

p. 346 of 433). Plaintiff's ability to concentrate and attend to tasks was "quite adequate" (Docket No.

10, p. 347 of 433). Furthermore, Dr. Konieczny indicated that Plaintiff showed "no symptoms of

hyperactivity, restlessness, or inattentiveness" (Docket No. 10, p. 347 of 433). Results from a WAIS-

IV test revealed that Plaintiff's most marked deficits were in the area of attention and concentration,

auditory imagery, and retentiveness (Docket No. 10, p. 348 of 433).

Based upon his evaluation, Dr. Konieczny concluded that Plaintiff did not, in fact, suffer from

ADHD (Docket No. 10, p. 348 of 433). The doctor noted that, "[a]lthough results of intellectual testing

place [Plaintiff's] capabilities in a range that could suggest a diagnosis of Borderline Intellectual

Functioning, her capabilities in several areas of intellectual and memory functioning extend beyond

that which would be considered typical for an individual suffering from such a diagnosis" (Docket No.

10, p. 348 of 433). State examiner Dr. Pawlarczyk seemed to agree with this assessment, given that he

21

concluded, based on a Psychiatric Review Technique and review of Plaintiff's medical records, that Plaintiff did not suffer from any medically determinable impairment (Docket No. 10, p. 352 of 433).

This Magistrate's own review of the record reveals that Plaintiff was quite capable of managing herself and her life. Plaintiff did graduate from high school and now lives independently and raises her two-year-old son (Docket No. 10, p. 56 of 433). Plaintiff stated that she can drive, cook, clean, and do laundry (Docket No. 10, p. 59 of 433). Plaintiff also testified that she takes care of her son, changing him and bathing him (Docket No. 10, p. 59 of 433). Counseling session progress notes demonstrate a definite improvement in Plaintiff's mental health issues. Records from 2009 and 2010 indicate that Plaintiff was "much improved and progressing well on current medications" (Docket No. 10, pp. 390, 396, 396, 399, 402 of 433).

Although it did not rise to the level of substantial gainful activity, Plaintiff did in fact work after her alleged disability onset date. Plaintiff was placed by the ODJFS as a clerk in a thrift store, working thirty hours per week (Docket No. 10, pp. 56-57 of 433). Plaintiff was terminated from the position in September 2010, possibly because of a negative attitude (Docket No. 10, pp. 57-58, 207 of 433). However, Plaintiff stated that if she had not been let go, she would have continued working (Docket No. 10, p. 61 of 433). This position exemplifies Plaintiff's ability and motivation to work.

As stated above, it is the duty of the factfinder, in this case the ALJ, to resolve any conflicts in evidence. *Richardson*, 402 U.S. at 399. While ALJ Breton discussed the findings of Dr. Koniecazny in detail in his decision, the ALJ fails to mention any of Plaintiff's childhood medical or educational records (Docket No. 10, pp. 40-47 of 433). The ALJ only briefly mentioned the records and findings of Ms. Siefker and Dr. Bentley (Docket No. 10, p. 43 of 433). While the outcome of the ALJ's analysis may remain unchanged, the ALJ is still under an obligation to resolve the conflict between Plaintiff's

22

childhood records and diagnoses and the findings of Ms. Siefker and Dr. Bentley, and the findings of

Drs. Koniecazny and Pawlarczyk. In the absence of this analysis, the Magistrate cannot assess whether

relevant evidence adequately supports the ALJ's conclusion at step three of the sequential evaluation.

Therefore, the decision of the Commissioner on this issue is reversed and this matter is

remanded to the ALJ to determine, based on the *entire* record, including Plaintiff's childhood medical

and educational evidence, whether or not Plaintiff suffers from ADHD as a severe impairment and if

that ADHD meets or medically equals the listing.

### 2.  PLAINTIFF'S  MENTAL RESIDUAL FUNCTIONAL CAPACITY

Plaintiff next alleges that the ALJ erred in finding Plaintiff's alleged depression to be a severe

impairment and offering functional limitations based on this conclusion (Docket No. 12, pp. 10-13 of

13). Specifically, Plaintiff argues that if "MACC notes convinced the ALJ that a severe impairment of

depression (but not ADD, ADHD, a learning disability, or a personality disorder) existed, but the

source did not provide any functional limitations, the ALJ had a duty to further develop the record in

regard to that impairment" (Docket No. 12, p. 11 of 13).

To properly determine a claimant's ability to work and the corresponding level at which that

work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v.*

*Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations,

residual functional capacity is designed to describe the claimant's physical and mental work abilities.

*Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and

mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse*

*v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a).

Residual functional capacity "is the individual's *maximum* remaining ability to do sustained work

activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). Before making a final determination a claimant is not disabled, the Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

Plaintiff certainly makes an uncommon argument, alleging not that the ALJ failed to assign *enough* limitations given Plaintiff's impairments, but, rather, that the ALJ erred by assigning too *many* limitations to Plaintiff (Docket No. 12, pp. 10-13 of 13). After a thorough review of the record as well as a careful analysis of the ALJ's decision, the Magistrate agrees.

As stated above, the ALJ has an obligation to render a decision regarding a claimant's residual functional capacity based upon all relevant evidence, medical and otherwise. 20 C.F.R. § 20.1545(a)(3). However, Social Security regulations *also* state that, when evaluating mental

24

impairments,

> if we rate the degree of your limitation in the first three functional areas a 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.

20 C.F.R. § 404.1520a(d)(1). The term "functional areas" refers to Paragraph B and C criteria. Here, ALJ Breton found that Plaintiff suffered only *mild* difficulties with regard to social functioning, concentration, persistence, and pace (Docket No. 10, p. 43 of 433). He found that Plaintiff had *no* restriction with regard to activities of daily living and *no* episodes of decompensation (Docket No. 10, p. 43 of 433). Absent evidence that Plaintiff's depression symptoms otherwise caused more than a minimal limitation in her ability to do basic work activities, the ALJ should have found Plaintiff's depression to be non-severe. Examination of the record as a whole reveals that Plaintiff's depression did not, in fact, cause anything more than a mild restriction on her work ability.

Plaintiff's current medical history centers around her need for and achievement of mental health treatment (Docket No. 10, pp. 296-433 of 433). Plaintiff's first contact with therapy and counseling occurred in January 2009 at New Beginnings where Plaintiff participated in Women's Group Counseling once a week for eight weeks (Docket No. 10, p. 344 of 433). From there, Plaintiff sought treatment from MACC, and described herself as being depressed on multiple occasions (Docket No. 10, pp. 372, 385, 392, 398, 404, 410, 416 of 433). Plaintiff was first diagnosed with depression in March 2009, and it was recommended that she seek psychiatric services and psychotherapy (Docket No. 10, p. 381 of 433). Plaintiff participated in therapy for eighteen months, until September 21, 2011 (Docket No. 10, pp. 296-433 of 433). During that time, Plaintiff was prescribed both Wellbutrin and Zoloft, and received gradual increased dosages of both medications (Docket No. 10, pp. 296-433 of 433).

By August 2009, Plaintiff's mental health practitioners were reporting that Plaintiff was "much improved" (Docket No. 10, p. 402 of 433). By October 2009, it was noted that Plaintiff was "progressing well on [her] current medications" (Docket No. 10, p. 396 of 433). Plaintiff's progress continued through 2010, and, on May 10, 2010, Ms. Johnson assigned Plaintiff a GAF score of sixty (Docket No. 10, p. 422 of 433). By May 24, 2010, Plaintiff herself was reporting that she was doing well (Docket No. 10, p. 385 of 433). During a psychiatric evaluation on July 20, 2011, Dr. Bentley found that while Plaintiff had some symptoms of depression, she did not meet the criteria for true depression (Docket No. 10, p. 431 of 433).

Given Plaintiff's improvement with therapy and medication, it is unlikely that her depression symptoms caused any more than a minimal limitation on her ability to work. In fact, the ALJ's opinion stated as much:

> In August 2009, [Plaintiff] stated her medications were working and she presented as brighter with a full affect.

> When seen in October 2009, [Plaintiff] stated she was doing well and denied any problems. Mental status examination was entirely normal except of continued limited insight. By January 2010, [Plaintiff] stated she was doing well on her medication, she was sleeping good and denied any problems. Mental status examination at that time was entirely benign. In May 2010, [Plaintiff] reported she was doing well and her moods were under control, but she continued to experience sleep difficulties, though due to very poor sleep hygiene. Mental status examination found her alert and oriented in all three spheres with appropriate behavior and . . . mood and affect. At that time, [Plaintiff] was found to have made good progress. Her mood was more elevated; she focused better and was currently employed thirty-hours per week. Her GAF score increased to 60.

(Docket No. 10, pp. 45-46 of 433). Despite these favorable findings, ALJ Breton later stated that Plaintiff was "somewhat more limited than noted" by state physicians (Docket No. 10, p. 46 of 43). He offered no evidence to support this conclusion (Docket No. 10, pp. 40-47 of 433). It therefore seems contrary to the evidence to label Plaintiff's depression as "severe." In the absence of further

elaboration and analysis, the Magistrate cannot support the decision of the ALJ on this issue.

Given the well-established law in this area, as well as the evidence contained in the record, the decision of the Commissioner on this issue is reversed and this matter is remanded to the ALJ to determine, based on the entire record, whether or not the ALJ's determination of Plaintiff's residual functional capacity is supported by substantial evidence.

### VIII. CONCLUSION

For the foregoing reasons, the Magistrate recommends that this matter be reversed and remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g). The Commissioner is ordered to consider Plaintiff's childhood educational and medical history, as well as the diagnoses of Ms. Siefker and Dr. Bentley, with regard to possible ADHD. The Commissioner is also ordered to conduct a full analysis of Plaintiff's residual functional capacity.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   May 17, 2013

### IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a

27

waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.